The first case this morning is 522-0757, Diebel v. Christopher Diercks. Arguing for the defendant appellant is Allison Golish. Arguing for the state appellee is Adam Trejo. Each side will have 10 minutes for the argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Good morning.  Morning. Ms. Golish, are you ready to proceed? I am, your honor. All right, you may do so when ready. Good morning, your honors. May it please the court, my name is Allison Golish, and I represent Mr. Christopher Diercks in this appeal. Today, I will address two main issues in this case. First, that the state failed to prove beyond a reasonable doubt that Mr. Diercks sent true threats of unlawful violence directed at Sheriff Bull. And second, that he did so knowingly. As to the first issue, the state failed to prove beyond a reasonable doubt that Mr. Diercks made true threats against his local sheriff, Shannon Wolf. Instead, Mr. Diercks was criminalized on the basis of his protected speech. The Stalking Statute permits criminalizing speech if it takes the form of a true threat. However, when pure speech is involved, it is important to separate out what constitutes a true threat versus speech that may be unpleasant but is not criminal. A true threat is one that communicates an intent to commit an act of unlawful violence to a particular individual. With this definition in mind, none of Mr. Diercks' text messages, as they were written, communicate a true threat of unlawful violence against Sheriff Bull. As the context of the text messages is significant to the analysis, I want to start by establishing some undisputed facts in this case. Mr. Diercks and Sheriff Wolf have known each other for decades. They went to school together. There are no allegations that Mr. Diercks has ever been violent towards Sheriff Wolf. Mr. Diercks regularly passes by Sheriff Wolf's home on his way to tend to his grandmother's farm, which is right next door. Mr. Diercks has texted Sheriff Wolf on his personal phone, often on for years to ask for help. On February 11, 2022, the date in question, this was just another such occasion. Many of Mr. Diercks' messages request help from the Sheriff's Department in dealing with drug traffickers in the community. Specifically, he is asking for Sheriff Wolf's deputy to call him so he can get him information he has about these traffickers. And this was not a one-way conversation. Sheriff Wolf responded 10 times over the three and a half hours. The state highlights a number of messages it viewed as threatening. And while these messages may have been inartful or inappropriate and may have come from a place of frustration, none of them amount to a true threat of unlawful violence, the issue today. For example, the state points to a statement such as, we can fight it out till the bitter end. The second part of that statement being, or you can let us help you. This statement is vague and ambiguous and at best references a vague willingness to fight. But that does not necessarily mean a physical fight. And this exact issue was addressed in People vs. Greenfield, where the- And so counsel, how about the statement, I promise you, I will walk right through those doors and come straight at you. Your Honor, the statement, I promise you, I will walk right through those doors and come straight to you That's only half of the statement. The second half of the statement is, just like I did when y'all was investigating me. This reference is a prior instance in which Mr. Dirks went to the county jail to clear up any sort of miscommunication. And there's no evidence or allegations that he has ever fought Sheriff Wolf before, he's ever shown up at his home uninvited. The court was not even forced to speculate in this instance, which would have been an improper speculation. But here the statement itself clears up any ambiguity. This was not a true threat of unlawful violence. This is distinguishable from a statement like this court saw in People vs. Perkins, where, and pardon my language, but the defendant there said, he was going to come to the police station tomorrow with 50 motherfuckers to fry the officer's ass. That, a true threat of unlawful violence. Here, Mr. Dirks is just trying to clear up any miscommunication if Sheriff Wolf felt that was necessary. Another statement- Can we look at the context of the text messages? Because Sheriff Wolf obviously thought he needed to protect his family and have this gentleman arrested. Can we look at his subjective intent? Your Honor, his subjective intent is not dispositive in this issue. For example, the Illinois Supreme Court in People vs. Rilleford recognized that the purported victim in that case felt the need to take a couple of days off of work, that she was scared, she was frightened by these statements, but they still found that merely distressing communications did not amount to a true threat of unlawful violence. So certainly the context could be relevant, but the fact that these text messages, these statements, when read in their context, actually indicate the opposite, that they were not a true threat of unlawful violence. Thank you. Moreover, to the videos and the photos that Mr. Dirks sent, again, as Justice Cates mentioned, that context is relevant. So for example, the video, Read Me My Rights, and again, My Apologies, But Whoop A Man's Ass, those are vigilante songs, and Sheriff Wolf recognizes as much in his testimony as well. And Mr. Dirks testified that he was analogizing to him going after these drug dealers he was concerned about. And not only does his testimony support that, but he incorporates quotes of some of these songs into his statements, which we encourage your honors to read in full. Because these statements, he follows up with an expression of love. He follows up with videos in which he has motivational speeches, such as a 40-minute long Matthew McConaughey motivational speech. He also has a video in which there is a sheriff in that video who is following around two individuals  but in reality, they're just trying to help his community. He testifies to the fact that that really resonated with him. He was just trying to help his community and he felt like he was, you know, after the fact it had been misconstrued, but he didn't even realize that in the fact. In fact, he used, again, those lyrics in his words in which he said that he felt everyone had this preconceived notion that he would prove them wrong by showing them he was good. So not only does his testimony support this, but also these text messages themselves have that. This is distinguishable, again, from a case in which a song could be used as a threat, People versus Crawford, where the statement was, get ready to meet your maker. I know how much you love that song. Take me to the king. Let's make it a reality. There, the defendant is using a song as a threat. He's saying, I want to kill you. Here, Mr. Dirks was not saying that. Mr. Dirks was not threatening violence. This is also supported by the photos. He sends a picture of a gun safe and ammo box and a receipt for the gun safe. And he testified that he explained their purpose. He was told by the sheriff's department. He was told by the sheriff himself that he needed to lock up his wife's guns for safety reasons. So he went, he bought that safety equipment, and he sent proof of purchase. Again, this was unrebutted. They could have easily called the sheriff back up to say, I never told him that. They could have called up people from the sheriff's department to say that. But instead, this is the reasonable, logical conclusion is that he's sending a receipt for the safety equipment. He then sent a picture of a check. He's saying, I've got things under control. I'm trying to do the right thing. Please listen to me. I really want to help this community. Again, distinguishable from cases in which there are true threats of unlawful violence, such as People v. Ashley, the seminal case. There, the defendant sent pictures of a handgun, said, I got guns, threatened to kill the individual, and has prior incidences of holding the individual at gunpoint. Readily distinguishable from a case here. And to the extent that this court even finds there were true threats of unlawful violence, there's no evidence that Mr. Dirks knowingly sent those statements with practical certainty that they would be viewed that way. The state proved that Mr. Dirks knew he sent the messages, and that sheriff was fearful. But the Illinois Supreme Court has held, and the United States Supreme Court has held, time and time again, that that does not equal knowledge. The state had to have shown that Mr. Dirks knew the character of the messages. He knew that sheriff would view them as threatening, not just the context. And Mr. Dirks repeatedly maintained that he did not know that. And while it doesn't have to be proved by direct knowledge, the circumstantial evidence in this case indicates a lack of knowledge. At the outset of this argument, we discussed all of the different contexts surrounding this case. They've known each other for years. No evidence of a violent history, any animosity. On that day, sheriff will never told him to stop messaging him, did not communicate fear, and continued the conversation, even saying things like, I get it, ma'am. I understand. Mr. Dirks did not know that he was communicating any true threat of unlawful violence. And in Counterman, the recent United States Supreme Court decision, knowledge or a subjective mental state is important. We view protective speech very seriously in this country. And therefore, to prove a true threat of unlawful violence and that someone had the subjective mental state to make a true threat of unlawful violence is a burden that the state needed to prove. The state did not meet the burden in this case. Again, distinguishable from other cases like People v. Ashley, in which the defendant told the victim, I'm calling the police. Or People v. Crawford, in which they showed up to a defendant with a knife, ready to harm the victim. Here, these were not true threats of unlawful violence, and Mr. Dirks did not know. So therefore, this court should reverse the conviction. Thank you. Okay, thank you, Ms. Gomesh. You'll have a few minutes after Mr. Trejo. Mr. Trejo, your argument, sir. Yes. May I please the court, counsel Adam Trejo, on behalf of the people of the state of Illinois. Defendant contests every element of the offense, including a mental state which he was never charged of. In this argument, he, she brings up two elements that these statements that he sent on the day of the incident were in true threat, and that he did not say knowingly. Now, as opposing counsel has indicated, context is key. Now, according to the defendant's argument, since the defendant and the sheriff knew each other for a period of years, he couldn't have committed stalking. But that's not true. Stalking happens all the time between two individuals, such as in a relationship. And it's very important to note that a couple of days before the incident, the sheriff told the defendant, do not contact me. I am not your personal cop. If you have an issue that needs reporting, contact the sheriff's office directly. And this came from the defendant himself. So in regards to the mens rea, he knew not to contact this officer. He didn't, this officer did not want to be contacted by the defendant. But does that really matter whether he wanted to be contacted or not? I mean, the Supreme Court has said that we, there must be an intentional or knowing threat of unlawful violence that the accused knows would cause a reasonable person to suffer significant mental suffering, anxiety, or alarm. Right, and the case law also states that the defendant doesn't actually have to have the intent to execute the harm, just that he knows that a reasonable person would perceive these statements as threats. And when he texted- What text specifically can you point to that shows a threat of harm? I mean, there's a lot of rambling going on here. Absolutely, one. Yes, one, we can fight it out till the better end. Now, as far as like the other sentences, it was for the trier of fact to determine if the officer would have perceived these as threats. And yes, there is no ambiguity. We can fight it out till the better end. And that's just the beginning. Then he goes, I promise you, I will walk right through those doors and come straight to you, just like I did when you were investigating me for this bullshit. I'm being charged now. Then he continues, buddy, you gotta learn today. And I'd like to emphasize that the stalking statute prohibits and encompasses indirect threats, implicit threats. So the defendant wants to frame the issue as, oh, the defendant didn't say, oh, I intend to cause you bodily harm based on two acts constituting course of conduct. No, the statute is written more broadly because individuals don't overtly say, I'm going to come at you. Although that's a form of threatening, it can also occur implicitly. And that's what he did when he sent the songs. Again, this was for the trial fact to conclude. The officer testified, I listened to those songs. And after I listened to them, I believed the defendant was speaking to me through those songs. So prior to sending the songs, he's saying, I will come straight to you. We can fight it out till the better end. And when the sheriff listened to those songs, these are the lyrics. Somebody better call the law. We done took it outside, we're about to brawl. A reference to fighting. Again, the defendant referenced fighting prior to sending those songs. Another lyric from the song, where I come from son, the next thing coming is an ass whooping in the parking lot. Upon listening to this music, the sheriff believes this defendant is speaking to me through these songs. Mr. Trejo, I need to interrupt you. The timer never started on your argument. I just noticed that. I need to let the clerk know. Okay. Everything, it's still not running. Okay, perfect. Okay, I apologize. Oh, thank you for pointing that out, your honor. Now, there's another song that he sends entitled, Whoop a Man's Ass. There's no ambiguity to what that song is referring to. And I, and repeatedly within that song, the lyrics go, you gotta whoop a man's ass sometimes. You gotta whoop a man's ass sometimes. Yeah, you gotta whoop a man's ass sometimes. And it's also important to know that the defendant made statements regarding his state of mind. At the bench trial, he stated- You were talking about the lyrics, but he didn't sing the song, did he? He just said part of it. No, no, no. Who said what you just said about the song? Did he say all that or not? It's in the song, but he didn't say it. He sent a link to the song, and the song is posted on YouTube. So what about the guy that sang the song? Is he also guilty? I'm sorry? The guy that sang the song, or anybody that listens to it, are they all guilty now? No, of course not. But there is case law that states... Let me just get to it. I cite a United States Supreme Court case. In context, again, he has context. Lyrics and songs that are performed for an audience, and this is a quote, are sold in recorded form and are unlikely to be interpreted as a real threat to a real person. The state has already addressed that. When those lyrics are pointedly directed at their victims, they are much more likely to be taken seriously. And this is a quotation from the United States Supreme Court. You said those lyrics are pointed, but he didn't say those lyrics. No, but he sent them to them directly so he can hear them. And those lyrics depict imagery of violence, of an individual whooping somebody's ass. And that's not me mischaracterizing the lyrics. Those are actual lyrics. He didn't say that. And again, the artist is singing it. However, I'd like to point to the statutes. Transmitting a threat, which I emphasize in the state's brief, which you all read, transmitting a threat means a verbal or written threat or a threat implied. Threat implied by a pattern of conduct or combination of verbal or written statements. This is an implied threat. The statute does not, this is covered under the statute. For example, you don't have to state, I'm going to do X, Y, and Z for it to constitute a threat. You could send an image of a knife, an image of a knife or guns in this case, which he did to imply that I'm going to use the weapons in these images against you, especially since he previously said, we can fight it out to the better end. I'm going to come straight to you. That is what he did. He was using these images, these songs to speak to him without directly stating it. That is covered under the statute, how it is written. He didn't use a gun. He used an ammo case, didn't he? He used three images. One was a sales receipt for a gun vault, which holds guns. He also sent an image of a box containing ammunition, which holds ammunition. But during the hearing, during the bench trial, the defendant testified that there was an incident involving Wolfe and himself regarding his wife's gun. And allegedly he was informed by the sheriff's office that he needed to secure that gun. So the defendant knew that Wolfe, the defendant knew that Wolfe knew that his family owned the gun, given the prior instance that the defendant testified. Well, doesn't the existence of that receipt that he paid for this for the gun case support the defendant's interpretation? This wasn't a threat. I'm just telling you, I did what you told me to do. And again, the self-servant testimony the defendant provided was rejected by the trial fact. The entirety of defendant's arguments rests on his own testimony at trial. That, oh no, I didn't intend to do this. I wanted to give him a tip, which he could have. He could have just texted him, hey, here's this tip in the three and a half hour conversation. But this was a question for the trial fact and finding the defendant guilty. The trial judge implicitly rejected the defendant's testimony regarding why he was sending those images, regarding his statements that he didn't think that another individual would view them as threatening. Yeah, that testimony, that self-serving testimony was considered by the trial fact and implicitly rejected by the trial judge in this case. Mr. Trayvon, I wanna ask you, I'm a little concerned about the trial judge's statement where he said, perhaps there isn't one incident or statement or writing that the court would conclude as stalking, but when you take it as a whole together. If the trial judge couldn't point to one incident, how do we arrive at the two incidents that you need to prove stalking in this case? My time is up. May I answer that question? Yes. I believe that the trial judge was talking about the case law, which states that you must view everything in context because it's the state's position that one of the links constitutes an act under the statute, under the stalking statute. However, if you isolate it and just take the link out of context, you don't know why he's sending that song. However, the inference that the defendant intended to threaten him and intimidate him strengthens when you look at the prior statements of, we could fight it out till the bitter end. So you can't isolate the links. You can't isolate the images by themselves because they don't make sense. You must look at the entire conversation to identify the acts and identify that that link, that link regarding whoop a man's ass is directly related to the prior statements of, I will constrict to you. We can fight it out till the better end. So you can't just isolate an image. You can't just isolate that link without knowing the entire context. Okay. Thank you very much. Thank you. Ms. Golas, you were about on? Thank you, your honors. If I may, I just want to take an opportunity to clarify the standard of review in this case, as I think it's a bit nuanced due to the constitutional facts at issue. I will address this in two parts. First, both the Illinois Supreme Court and the United States Supreme Court have recognized when you're dealing with pure speech, there's an independent review of the record to assess the testimony to determine and the statements to determine whether the speech amounts to a true threat of unlawful violence or is protected by the First Amendment. In other words, this court should defer to the circuit court's fact finding, but the appellate court makes its own determination on whether those facts established a true threat of unlawful violence. And the messages here sent by Mr. Dirks, they're not in dispute. And so this appellate court can and should look at those text messages for themselves, considering the context and considering the testimony of both individuals and make its own determination of whether or not these are true threats of unlawful violence. And as I'm sure this court is well aware, the appellate courts only have to give deference to reasonable conclusions. And as Justice Steinman referenced in People v. Roach, speculation about whether something is a true threat of unlawful violence is improper. If it's unclear from the statement and from the context that these are true threats, then the circuit court cannot find that there was a criminal violation here. The statement in that case was quote, I'm going to get that judge. And sure, that statement, I'm gonna get that judge. And then the defendant was asked in that case, is that a threat? And he said, I don't make threats, I make promises. That statement was still found to not be a true threat of unlawful violence because what does I'm going to get that judge even mean? We don't know. And if the court has to speculate, that is not a criminal act. That is similar again to People v. Greenfield, I never lose when I fight for the truth. And the statement fight it out to the end, dictionary.com gives an example of that statement. It says the two sides couldn't agree on a budget, but were determined to fight it out to the end. I don't think that people disagreeing on a budget were suggesting they were going to get into a physical altercation. And here Mr. Dirks certainly was not. As to the videos that he sent, the vigilante videos, read me my rights, describes a cop. The reasonable inference, and truly the only inference in this case that would be reasonable is that sheriff or is the cop in that case, not the one who would be beat up. Same with what the man's asked. Both of those videos describe someone who was doing something bad. And then the person is going to go and take it into their own hands. Mr. Dirks testifies to that, but he also says it in his statement. And I would like to point out that the Alonis decision that counsel is pointing to about the pointedly directed at their victims, that's a concurrence. The actual decision was a remand because they said that it was based on an objective mental state, not a subjective mental state. Also those facts in that case, the defendant wrote his own rap lyrics that indicated a desire to harm his ex-wife. That's not what happened here. He just sent some YouTube links. And to the extent that they were related to prior statements, they were related to the prior statements of please help me. I would like you to help me. We can fight on this. We can try and figure it out, but please help me. He says this 10 times. This isn't a statement in which he just says, we can fight or I'm going to come straight to you. I'm going to whoop your ass. It's three and a half hours of conversations. He's saying, thank you. He's saying, I love you. He's saying, God bless. Please look at these statements, read them in their entirety. Mr. Dirks was not communicating a true threat of unlawful violence, unwanted communication, anger, agitation. This court, other appellate courts, the Illinois Supreme Court has been over that time and time again. There's a litany of cases that address it. And I go through it in my brief as well. That does not amount to a true threat of unlawful violence. This is a felony conviction for stalking. Mr. Dirks was not stalking Sheriff Bull. He was trying to get help. And my client, he may not be the most articulate. He was clearly very passionate. His mother died because of drug trafficking, because of this stuff in his community. And he felt strongly about it. He felt frustrated about it. And he even felt angry. He admitted to all of that on the stand, but he did not feel that he needed to threaten the Sheriff. He was not trying to do so. And therefore this court must reverse his conviction for stalking. Thank you so much, Your Honors. All right. Thank you both for your arguments here today. This matter will be taken under advisement and we will issue an order in due course.